CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JUL 02 2018
JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| BRENDA S., | ) | |
| Plaintiff, | ) | Civil Action No. 4:17-cv-00008 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| COMMISSIONER OF | ) | By:  Joel C. Hoppe |
| SOCIAL SECURITY, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Brenda S. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decision denying her application for disability insurance

benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434.

The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the

administrative record, the parties' briefs, and the applicable law, I find that substantial evidence

supports the Commissioner's final decision. Therefore, I recommend that the Court deny Brenda

S.'s Motion for Summary Judgment, ECF No. 15, grant the Commissioner's Motion for

Summary Judgment, ECF No. 19, and affirm the Commissioner's final decision.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*,

88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Brenda S. protectively filed for DIB on October 11, 2012, alleging disability caused by bilateral carpal tunnel syndrome. Administrative Record ("R.") 60, ECF No. 11-1. Brenda S. alleged onset of disability as December 15, 2011, at which time she was thirty-eight years old. *Id.* Disability Determination Services ("DDS"), the state agency, denied her claim at the initial, R. 60–67, and reconsideration stages, R. 69–78. On July 15, 2015, Brenda S. appeared with counsel and testified at an administrative hearing before ALJ H. Munday. *See* R. 34–52. A vocational expert ("VE") also testified at this hearing regarding the nature of Brenda S.'s past work and the availability of other work she could perform in the national economy. *See* R. 50–58.

On September 9, 2015, ALJ Munday denied Brenda S.'s application in a written decision. R. 14–26. She determined that Brenda S. had severe impairments of carpal tunnel syndrome and obesity. R. 16. All other impairments she deemed non-severe, and none of Brenda S.'s severe impairments met or medically equaled a listed impairment. R. 17–19. As to Brenda S.'s residual functional capacity ("RFC"), the ALJ found that she could "perform light work as defined in 20 C.F.R. § 404.1567(b),"[1] except she could frequently balance, stoop, kneel, crouch, and climb ramps and stairs; occasionally crawl; never climb ladders, ropes, or scaffolds; and frequently

---

[1] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 404.1567(b). A person who can meet these lifting requirements can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990).

handle objects and perform push-and-pull activities with her right lower extremity. R. 19; *see also* R. 20–24. She also could have only occasional exposure to vibrations, frequent exposure to pulmonary irritants, and frequent exposure to hazardous conditions. *Id.* Last, she would need to elevate her arms and hands during regularly scheduled breaks and lunch. *Id.* Relying on this RFC finding and the VE's testimony, the ALJ found that Brenda S. could not perform her past relevant work. R. 24. She could, however, perform certain widely available "light" jobs such as short order cook; "dining room attendant, silver wrapper"; and "maid, house person." R. 24–25. Therefore, ALJ Munday determined that Brenda S. was not disabled. R. 25. The Appeals Council denied Brenda S.'s request for review, R. 1–4, and this appeal followed.

### III. Background

A.    *Relevant Medical Evidence*

Prior to the alleged onset date, Brenda S. had a history of carpal tunnel surgery on the right in 1998 and on the left in 2005. R. 230.

On May 4, 2012, Brenda S. presented to Michael Diminick, M.D., reporting hand and finger pain after she hit her right hand against a tree. R. 221–23. Physical examination revealed full range of motion of the hand and wrist, good intrinsic hand and wrist flexion/extension strength, and no thenar atrophy, and Dr. Diminick assessed a right fourth digit fracture and prescribed Lortab. R. 221. When she returned on May 24, Brenda S. could not make a full fist and had pain with range of motion, but she had 5/5 strength throughout, including wrist flexors and extensors. R. 224–25. On June 28, Brenda S. explained that she had injured her back in a motor vehicle accident, which she thought also exacerbated her carpal tunnel symptoms on the right. R. 227. She was tender throughout the right hand on physical examination, but had intact sensation and full strength throughout, including the wrist flexors and extensors. *Id.* Dr.

4

Diminick agreed that the motor vehicle accident may have exacerbated Brenda S.'s carpal tunnel symptoms, and he renewed prescriptions for Lortab and Tramadol and gave her a wrist splint to wear at night. *Id.*

On October 2, Brenda S. saw Joyce Huerta, M.D., for a nerve conduction study and examination of her bilateral hand pain and swelling. R. 230–31. On physical examination, Dr. Huerta observed 5/5 strength in both upper extremities, including shoulder abduction, elbow flexion, wrist extension, elbow extension, finger abduction, and thumb opposition. R. 230. Brenda S. had intact sensation throughout and no gross atrophy of the hand intrinsic muscles. *Id.* Spurling's Sign, Tinel's Sign over the wrist and elbow, Phalen's Sign, and carpal tunnel compression tests were all negative bilaterally. *Id.* The nerve conduction study revealed an abnormal examination, with "electrodiagnostic evidence of a moderate, right, median mononeuropathy at the wrist (carpal tunnel syndrome) without axon loss" and "electrodiagnostic evidence of a mild, left median mononeuropathy." *Id.* Two days later Dr. Diminick assessed Brenda S. with carpal tunnel syndrome on the right that required revision surgery. R. 232.

Dr. Diminick performed the right carpal tunnel release revision on January 2, 2013. R. 249. For the postoperative plan, Dr. Diminick recommended "routine management . . . [with] therapy to minimize her pain medicine." *Id.* During a follow-up visit on January 17, Brenda S. reported her status as improving and that severe pain was rare. R. 263. She had not been participating in rehabilitation, but had been doing home exercises. *Id.* Dr. Diminick noted that Brenda S. would start occupational therapy to work on desensitization and range of motion, and he gave her one prescription for Percocet. *Id.*; *see also* R. 266. On February 12, Brenda S. reported persistent pain and numbness on the right, as well as pain on the left, although a physical examination was normal. R. 272. Brenda S. stated that she was taking "6 to 8 pain pills

per day." *Id.* Dr. Diminick "explained that it takes time for the nerve to heal and that her symptoms should subside with time," and he refilled her pain medication and prescribed Medrol Dosepak. *Id.* Brenda S. began treating with John Lesko, M.D., a pain management specialist, on February 22. R. 291. She reported a twenty-year history of chronic, severe pain in her hands that was exacerbated by activity and relieved with medication. *Id.* On physical examination, her shoulders, arms, and hands had normal appearance and no crepitus or defects. R. 293. Dr. Lesko prescribed Topamax and Voltaren gel for her wrists. *Id.* On March 1, Brenda S. complained of decreased range of motion and "incapacitating" pain in both hands, which was relieved by elevation. R. 289. Physical examination remained unchanged, and Dr. Lesko added a prescription for oxycodone to go along with the Topamax. R. 290–91.

On March 20, Carolina Bacani-Longa, M.D., completed a physical RFC assessment as part of the initial state agency review of Brenda S.'s application. R. 61–65. Dr. Bacani-Longa opined that Brenda S. could lift and/or carry twenty pounds occasionally and ten pounds frequently, could sit about six hours and stand and/or walk about six hours in an eight-hour workday, and would be limited in her ability to push and/or pull with the right lower extremity. R. 64–65. Dr. Bacani-Longa explained that she based these limitations on Brenda S.'s right carpal tunnel release procedure performed on January 2. R. 65.

Brenda S. followed up with Dr. Lesko on March 29 and on May 23, each time complaining of severe pain that was exacerbated by hand motion and moderately limited her activities. R. 285–89. On June 20, Brenda S.'s complaints were unchanged, and physical examination revealed tendon sheath swelling, positive Finkelstein's test, positive Tinel's sign, and atrophy in the right upper extremity. R. 283–84. Brenda S. returned to Dr. Diminick on August 22 complaining of bilateral hand pain and numbness on the right. R. 279–80. She had

6

been taking Lortab 15 mg four times per day and Morphine time-released capsules three times per day for her symptoms. *Id.* Dr. Diminick noted that she was having "difficulty with pain management," but he counseled against further surgery. *Id.* Brenda S. treated one more time with pain management on August 27 and rated her pain as 10/10. R. 282. She agreed to tapering off her medications and had her oxycodone refilled. *Id.*

On December 20, Tony Constant, M.D., completed a physical RFC assessment as part of the state agency reconsideration review of Brenda S.'s application. R. 70–76. Dr. Constant imposed the same exertional restrictions as did Dr. Bacani-Longa. R. 75–76. He also found that Brenda S. could frequently balance, stoop, kneel, crouch, and climb ramps and stairs; occasionally crawl; and never climb ladders, ropes, or scaffolds. R. 76.

The record does not show that Brenda S. received any additional treatment until November 5, 2014, when she presented to Gregg Albers, M.D., for an evaluation of opioid dependency and chronic pain. R. 562–63. Brenda S. reported that she took 60 mg of hydrocodone and 120 mg of oxycodone a day by prescription, but she still bought "more on the street." R. 562. She explained that the most recent carpal tunnel surgery had not helped her pain and that she was depressed, although she had not sought treatment for the latter condition. *Id.* Findings on physical examination were normal. R. 562–63. Dr. Albers assessed chemical dependency, narcotics; depression; carpal tunnel syndrome; and peripheral neuropathy, and he prescribed Suboxone, Xanax, Prozac, and gabapentin. R. 563. Brenda S. treated with Dr. Albers ten more times during the ensuing months, with her final visit coming on July 6, 2015. *See* R. 564–81. She consistently complained of severe and debilitating pain in her bilateral hands, *see id.*; indeed, on February 20, 2015, she claimed that she was "not functional" at her current level of pain, R. 569. However, other than noting "some weakness" in her right upper extremity on

7

November 19, 2014, R. 564, Dr. Albers's findings on physical examination revealed no

abnormalities, *see* R. 565–81. As for treatment, Dr. Albers frequently adjusted her medications,

counseled her on following the medication regimen, and recommended she see a neurologist, but

the record does not reveal whether she ever followed up on this recommendation. R. 564–81.

Dr. Albers also filled out a physical RFC medical source statement on July 6, 2015, R.

555–58, in which he noted diagnoses of neuropathy, panic attacks, and chronic obstructive

pulmonary disease, R. 555. Brenda S.'s prognosis was poor, and her symptoms included severe

burning, shooting pain from her neck to her hands. R. 555. Dr. Albers opined that she could

occasionally lift or carry less than five pounds, but could never lift or carry five pounds or more.

R. 555–56. She could not walk more than one city block without rest or severe pain, could not

climb steps at a reasonable pace without the use of a handrail, and would have "some" problems

with balance when ambulating and with stooping, crouching, and bending. R. 556. Further,

during a normal eight-hour workday, she could sit for less than one hour, could stand and walk

for less than one hour, and would need to lie down and/or recline for less than one hour to relieve

fatigue and pain. *Id.* Brenda S. would need to take unscheduled, twenty to thirty-minute breaks

every ten minutes during which she would elevate her hands and arms to help with pain. R. 556–

57. Brenda S. could not use her hands for grasping, twisting, and turning objects, her fingers for

fine manipulations, or her arms for reaching (including overhead) because of neuropathy in both

hands. R. 557. She could not climb stairs, ladders, scaffolds, ropes, or ramps. *Id.* Her depression

and anxiety contributed to the severity of her symptoms and limitations, and her pain and stress

were both severe enough to constantly interfere with the attention and concentration needed to

perform simple work tasks. *Id.* Brenda S. would be off task more than 30% of the workday,

absent more than five days a month, and perform at least 50% less efficiently than an average

worker. R. 558. Dr. Albers based his opinion on "history and medical files," "physical examinations," and "psychological evaluations, tests, & reports/opinions." *Id.*

B.    *Brenda S.'s Report of Symptoms and Testimony*

Brenda S. completed two Adult Function Reports as part of her application for benefits. R. 153–60 (Nov. 2012), 179–86 (July 2013). She reported that she lived in a house with her teenage son and did not do much during an ordinary day other than sit with her arms propped up to relieve the pain. R. 153, 179. Pain kept her up at night, and she had difficulties with personal care. R. 159, 180. She fixed microwave meals or sandwiches, but otherwise avoided cooking, which marked a change from before her impairments began as she used to cook for a living. R. 158, 181. She did small chores, such as laundry, but she could not fold or iron clothes, and she did no yard work. R. 154, 158, 181–82. She went outside only once a week because she could not afford to go anywhere and because of anxiety. R. 154, 182. She initially reported driving, R. 154, but later explained that she avoided it because of her anxiety, R. 182. She shopped for food monthly and only went to the doctor's office regularly. R. 154, 182. She had no hobbies other than watching television. R. 155. She had difficulty lifting, reaching, using her hands, remembering things, concentrating, understanding, and getting along with others. R. 156, 184. She could lift only a "couple pounds," but could do so for no more than thirty seconds. R. 184. It hurt to reach and use her hands. R. 156. She could walk for five to ten minutes before needing to rest. R. 156, 184. She used a brace/splint, which had been prescribed by a doctor, for both hands daily. R. 157, 185. In July 2013, Brenda S. explained that it took her "days just to complete th[e] form due to having to start and stop," and that the deterioration of her hands, and the attendant lack of income from an inability to hold a job, caused her to be depressed. R. 186.

At the administrative hearing in July 2015, Brenda S. testified that she experienced terrible pain from carpal tunnel syndrome and that surgery had not helped. R. 42–43. She had trouble gripping objects and could do so only for a short time before she would drop whatever she was holding. R. 43. At the recommendation of her doctor, she elevated her hands on pillows every night to alleviate her symptoms. *Id.* She could lift and carry five pounds, but not for very long. R. 44. She also could pick up dishes to wash them, but could only do a few at a time before needing a break. *Id.* She wore wrist braces during the day to keep from using her hands, but she did not wear them all the time because they hurt her hands. R. 45–46. She drove very rarely, at most two or three times per month. R. 51.

## IV. Discussion

Brenda S. presents three challenges on appeal. First, she asserts that ALJ Munday erred in assessing Dr. Albers's opinion, particularly as it related to her ability to lift and carry no more than five pounds. Pl.'s Br. 5–6, ECF No. 16. Second, she contends that substantial evidence did not support ALJ Munday's finding that she could "frequently" handle objects. *Id.* at 6–7. Third, she argues that ALJ Munday "erred by failing to state how many pounds [Brenda S.] can lift and carry," and as such, substantial evidence did not support a conclusion that she "can lift and carry any weight whatsoever." *Id.* at 7. Brenda S. further argues that this omission led to ALJ Munday's failure to provide both a narrative discussion and a function-by-function assessment and that ALJ Munday violated a "key holding" in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), by "express[ing Brenda S.'s] RFC as 'light' before stating how much she could lift and carry." *Id.* at 7–9.

A claimant's RFC is the most she can do on a regular and continuing basis despite her impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is a

factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined limiting effects of impairments that are supported by the medical evidence or the claimant's credible complaints, *see Mascio*, 780 F.3d at 638–40. The ALJ's RFC assessment "must include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion," *Mascio*, 780 F.3d at 636, and why she discounted any "obviously probative" conflicting evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977); *see also Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). None of Brenda S.'s arguments challenging ALJ Munday's RFC determination are persuasive.

A.    *Dr. Albers's Opinion*

Brenda S. contends that ALJ Munday "erred by failing to give controlling weight" to Dr. Albers's medical opinion, specifically as it related to his conclusion that she could not lift or carry more than five pounds. Pl.'s Br. 5. Medical opinions are statements from "acceptable medical sources," such as physicians, that reflect the source's judgments about the nature and severity of the claimant's impairment, including her symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. 20 C.F.R. § 404.1527(a)(1). A treating physician's medical opinion is "entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see* 20 C.F.R. § 404.1527(c)(2). If the ALJ determines that the opinion is not entitled to controlling weight, then the ALJ must adequately explain the weight she afforded the opinion, taking into account all relevant factors, including the nature and extent of the physician's treatment relationship with the

11

claimant; how well the physician explained or supported the opinion; the opinion's consistency

with the record as a whole; and whether the treating physician's opinion pertains to his or her

area of specialty. 20 C.F.R. § 404.1527(c); *see also Radford v. Colvin*, 734 F.3d 288, 295–96

(4th Cir. 2013). Although treating physicians' medical opinions deserve deference, the ALJ may

discount or reject such an opinion when there is "persuasive contrary evidence" in the record.

*Mastro*, 270 F.3d at 178; *see Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014)

(per curiam); *Hines*, 453 F.3d at 563 n.2.

      Brenda S. contends that "the ALJ cited no 'persuasive contradictory evidence' to warrant

the rejection of Dr. Albers's opinion regarding the severity of" her carpal tunnel syndrome,

which she asserts was "well-supported and not inconsistent with other substantial evidence."

Pl.'s Br. 5. Brenda S. then argues that the "ALJ's only reason for rejecting" Dr. Albers's opinion

on this point "was that [she] (supposedly) live[d] an hour away from Dr. Albers'[s] office,"

which led the ALJ to conclude that if Brenda S. could "drive an hour each way . . . then she

[could not] be as impaired as Dr. Albers said." *Id.* at 5–6. Brenda S. specifically faults the ALJ

for relying on this reasoning in rejecting Dr. Albers's opinion regarding the amount of weight

she could lift or carry because "it is unsupported and speculative to say that one who can drive

for two hours can lift more than five pounds." *Id.* at 6. Brenda S.'s challenge to ALJ Munday's

weighing of Dr. Albers's opinion fails, however, because she misreads the ALJ's decision.

      Under the regulations, a treating physician's medical opinion "is entitled to controlling

weight if it is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in the record." *Mastro*, 270

F.3d at 178. "Thus, 'by negative implication, if a physician's opinion is not supported by clinical

evidence or if it is inconsistent with other substantial evidence, it should be accorded

significantly less weight.'" *Id.* (quoting *Craig*, 76 F.3d at 590 (brackets omitted)). Here, ALJ

Munday cited contradictory evidence and sufficiently explained her decision to assign Dr.

Albers's entire opinion "little weight." In summarizing her conclusion, ALJ Munday stated that

Dr. Albers's opinion was "not consistent with the rest of the evidence of record." R. 23. In doing

so, the ALJ offered several specific examples highlighting inconsistencies between Dr. Albers's

opinion and the rest of the record. Because substantial evidence supports these examples, remand

is not necessary. *See, e.g.*, *Sharp v. Colvin*, 660 F. App'x 251, 257 (4th Cir. 2016) (affirming the

ALJ's assignment of little weight to the treating physician's opinion when the ALJ concluded the

opinion was inconsistent with the physician's office notes); *Kersey v. Astrue*, 614 F. Supp. 2d

679, 693 (W.D. Va. 2009) (explaining that an ALJ may assign "little to no weight" to a treating

physician's medical opinion, based on the factors set out in 20 C.F.R. § 404.1527(c), if the ALJ

"sufficiently explains his rationale and if the record supports his findings").

    Most importantly for purposes of Brenda S.'s argument, the ALJ found that Brenda S.'s

ability to drive in at least some capacity, a conclusion derived from both her testimony and Dr.

Albers's notes that she lived up to an hour away, was inconsistent with multiple aspects of Dr.

Albers's opinion. R. 22. Dr. Albers concluded that Brenda S. could not sit for more than one

hour during an eight-hour workday and could *never* use her hands, arms, or fingers for *any*

manipulative tasks. R. 556–57. As the ALJ noted, however, the total commute time to and from

Dr. Albers's office exceeded one hour,[2] during which she ostensibly sat in the car, and Brenda

---

[2] Brenda S. takes issue with the accuracy of Dr. Albers's note and asserts, citing Google Maps, that the
commute from her house to Dr. Albers's office is less than forty-five minutes. Accepting this assertion as
true, her total commute still exceeds one hour, which is more than Dr. Albers opined she could sit. But on
substantial evidence review, the Court cannot go outside the administrative record to test the ALJ's
factual determination. *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991)
("Reviewing courts are restricted to the administrative record in performing their limited function of
determining whether the [Commissioner's] decision is supported by substantial evidence."). As the ALJ
noted, Dr. Albers reported that Brenda S.'s roundtrip drive to his office was two hours. *See* R. 22 (citing

S.'s admitted ability to drive necessarily indicated that she could "use her hands to grasp and manipulate objects *to a greater degree* than Dr. Albers indicated," R. 22 (emphasis added), which, according to Dr. Albers, was zero percent of the time. In other words, ALJ Munday looked to this evidence, which suggested Brenda S. retained the ability to use her hands at least to some extent, and deemed it inconsistent with Dr. Albers's opinion concluding that Brenda S. could not do any manipulative tasks. It was not unreasonable for the ALJ to rely on this evidence to question Dr. Albers's imposition of extreme limitations relating to Brenda S.'s handling and sitting abilities.[3]

Next, ALJ Munday offered additional reasons that supported her evaluation of Dr. Albers's opinion. Dr. Albers opined that Brenda S. could stand and walk less than an hour during an eight-hour workday, R. 556, but, as ALJ Munday noted, "the evidence of record does not indicate [that] she [had] any difficulties walking or standing," R. 22. Indeed, treatment notes contain only evidence of normal gait, *see* R. 282, 284, 293, Brenda S. herself did not indicate difficulty standing or walking in her application materials, *see* R. 156, 184, and, other than an isolated remark that she wanted to see a podiatrist for multiple foot problems, R. 580, she never reported similar problems or functional limitations to Dr. Albers, *see* R. 562–81. As such, it was not improper for the ALJ to "consider[] the absence of clinically documented medical evidence" in finding Dr. Albers's opinion inconsistent with the record. *Mastro*, 270 F.3d at 178; *see Bishop*, 583 F. App'x at 67 (substantial evidence supported ALJ's decision to reject treating physician's opinion "in its entirety" where the ALJ made clear "that he concluded that the doctor's opinion

---

R. 578). An adequate basis exists in the record for the ALJ's factual finding, and the Court will not consider extrinsic, contradictory information.

[3] Brenda S.'s argument that the ALJ erred in relying on this reasoning to reject Dr. Albers's lifting and carrying restriction misses the mark because the  ALJ never connected this evidence to Brenda S.'s remaining lifting/carrying capacities.

was not consistent with or supported by the medical evidence," including the "mild to moderate diagnostic findings . . . and the generally normal findings during physical examinations").

ALJ Munday also identified Dr. Albers's conclusion that Brenda S. could "lie down or recline, sit, stand, or walk for a total of less than three hours during an eight-hour workday," but determined that "[b]ased on the evidence of record this does not seem credible." R. 22. Although the ALJ misstated Dr. Albers's opinion—he stated that Brenda S. would need to, not could, lie down or recline for less than an hour, R. 556—the broader point stands: Dr. Albers's math does not add up, as his opined limitations leave Brenda S.'s postural status (from lying down to walking) unaccounted for during more than half the workday. As the ALJ noted, Dr. Albers's opinion is further undermined by the fact that the record contains no evidence that Brenda S. had standing or walking difficulties or problems sitting for a longer period.

In sum, ALJ Munday offered several good reasons to support her overall conclusion that Dr. Albers's opinion was inconsistent with the record as a whole. To be sure, she did not specifically mention Dr. Albers's conclusions regarding the amount of weight Brenda S. could lift and/or carry, but there is no requirement that the ALJ address every part of a treating physician's opinion as long as her decision provides a logical explanation, supported by substantial evidence, for the limitations assessed in the RFC. *See Reid*, 769 F.3d at 865 ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision." (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam))); *cf. Keene v. Berryhill*, --- F. App'x ---, 2018 WL 2059514, at *3 (4th Cir. May 2, 2018) (per curiam) ("There is no requirement . . . that the ALJ provide an exhaustive point-by-point breakdown of each and every listed impairment. Rather, the ALJ is compelled to provide a coherent basis for [her] step-three determination."). Thus, when the ALJ offers "good reasons" supported by

substantial evidence for the weight assigned to the entirety of a treating physician's opinion, the

Court will not disturb that assessment. *See Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir.

2015) ("We must defer to the ALJ's assignments of weight unless they are not supported by

substantial evidence.").

B.      *Brenda S.'s Ability to Handle Objects*

Brenda S. next argues that "[t]he ALJ's finding that [she] can frequently handle objects is

not based on substantial evidence."[4] Pl.'s Br. 6. Brenda S. states,

> [e]ven if Dr. Albers was incorrect in finding that [she] was incapable of handling
> objects, this would not reasonably imply that [she] could handle objects
> *frequently*. Given the constancy and severity of [her] pain, the fact that she wears
> splints on both wrists, and the fact that she has had three carpal tunnel surgeries . .
> . the only rational conclusion is that if Dr. Albers was wrong, he was not *so* wrong
> as to warrant a finding that [she] can handle objects frequently. If Dr. Albers was
> wrong, it would be rational to say that [she] can handle objects 'occasionally,'
> that is, up to one third of the day. It is irrational and unfounded to say that because
> Dr. Albers was incorrect, or that because [she] could drive for two hours a day,
> she can handle objects *frequently*—up to [two] third[s] of the day. The ALJ failed
> to explain her reasoning, and the facts simply don't support her conclusion.

*Id.* at 6–7 (citations omitted).

First, Brenda S.'s physical examinations were primarily normal and, as such, support ALJ

Munday's conclusion. A treatment note from June 28, 2012, documents that Brenda S.

complained of carpal tunnel pain, but she had intact sensation, no swelling, and 5/5 motor

strength bilaterally despite tenderness throughout the right hand. R. 227. Then, physical

examination on October 2 revealed 5/5 strength in wrist extension, finger abduction, and thumb

opposition bilaterally; no gross atrophy of the hand intrinsic muscles; and negative Spurling's,

Tinel's over the wrist and elbow, Phalen's, and carpal tunnel compression tests bilaterally. R.

230. A nerve conduction study revealed moderate carpal tunnel syndrome on the right and mild

---

[4] "'Frequent' means occurring from one-third to two-thirds of the time." SSR 83-10, 1983 WL 31251, at
*6 (Jan. 1, 1983).

carpal tunnel syndrome on the left. *Id*. During two postoperative follow-ups in early 2013, Dr.

Diminick observed minimal to no swelling; intact median, ulnar, and radial nerves; symmetric

strength; and well-healing wound, although range of motion was limited for the first follow-up.

R. 263, 272. Brenda S. also saw a pain management specialist six times from February 2013 to

August 2013, each time complaining of severe pain, but when physical examinations were

performed, they usually did not reveal abnormalities. *See* R. 286, 290, 293. On one occasion,

examination showed swelling, atrophy, positive Tinel's sign, and positive Finkelstein's test. R.

284. Treatment notes from Dr. Albers covering late 2014 and the first half of 2015 generally

revealed no physical abnormalities, *see* R. 565–79, although he counseled Brenda S. to wear a

hand brace, R. 569. The ALJ's finding that Brenda S. could drive—an activity that requires

grasping the steering wheel—for two hours on her round trip visits to Dr. Albers provides

additional support for the ALJ's determination that she could handle objects frequently, i.e. for

1/3 to 2/3 of an eight-hour day.

Furthermore, as discussed above, substantial evidence supports ALJ Munday's decision

to accord Dr. Albers's opinion, which is the only medical evidence of record identifying

handling restrictions, little weight. The only other evidence in the record of handling limitations

comes from Brenda S.'s report of symptoms. The ALJ credited her statements to a degree,

finding that her limitations were not as severe as claimed, and Brenda S. does not challenge ALJ

Munday's credibility assessment. Moreover, Brenda S. does not explain why wearing splints on

her wrists or having had three carpal tunnel surgeries (in 1998, 2005, and 2013) necessarily

precludes her ability to "frequently" use her hands. Beyond this, Brenda S. fails to identify any

evidence calling the ALJ's conclusion into doubt, *see Reid*, 769 F.3d at 865 ("Indeed, Reid has

failed to point to *any* specific piece of evidence not considered by the Commissioner that might

have changed the outcome of his disability claim."), which is supported by the largely benign medical evidence and the DDS physicians' opinions, *see infra*. As it is Brenda S.'s burden to demonstrate her functional limitations, *see, e.g.*, 20 C.F.R. § 404.1512(a), I do not find that the ALJ's decision to limit her to frequent handling was unreasonable, or that this limitation is not supported by substantial evidence in the record.

C.   *Brenda S.'s Ability to Lift and Carry*

Last, Brenda S. asserts that the ALJ "never did state how much [she] could lift and carry," which led to the ALJ's failure to provide both the narrative discussion and function-by-function analysis contemplated by *Mascio*. Pl.'s Br. 7–8. Put another way, she contends that "the ALJ did not merely express [her] RFC as 'light' before stating how much she could lift and carry—an unmistakable violation of *Mascio* and SSR 96-8p— but failed to make *any* finding as to how much [she] can lift and carry. The case is thus immediately reversible." *Id.* at 8. This argument is unpersuasive.

ALJ Munday found that Brenda S. could do "light work as defined in 20 C.F.R. § 404.1567(b)." R. 19; *see also* R. 23 ("The evidence of record indicates the claimant would be capable of work at the light exertional level."). This regulation states that "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). It is sufficiently clear that ALJ Munday "found" Brenda S. could occasionally lift up to twenty pounds and frequently lift up to ten pounds, even if she did not express that finding as precisely as she could have. Thus, I cannot agree with Brenda S.'s assertion that the ALJ "failed to make *any* finding as to how much [Brenda S. could] lift and carry," Pl.'s Br. 8. *Cf. Chatman v. Colvin*, No.4:15cv80, 2016 WL 8199317, at *7 (E.D. Va. Mar. 30, 2016) ("Even if the ALJ did not recite what Chatman considers to be the proper—or magic—

words, the ALJ's decision is not then necessarily improper or unsupported by substantial

evidence."), *adopted by* 2016 WL 8200942 (E.D. Va. Sept. 23, 2016).

Nor is the second half of Brenda S.'s challenge persuasive. Social Security Ruling

("SSR") 96-8p "instructs that the [RFC] 'assessment first must identify the individual's

functional limitations or restrictions and assess his or her work-related abilities on a function-by-

function basis, including the functions' listed in the regulations," before the RFC finding can "be

expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very

heavy."[5] *Mascio*, 780 F.3d at 636 (quoting SSR 96-8p, 1996 WL 374184, at *1); *see* 20 C.F.R. §

404.1545(b)–(d). An ALJ's failure to "perform an explicit function-by-function analysis,"

however, does not automatically require reversal and remand. *Mascio*, 780 F.3d at 636. "Remand

may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant

functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's

analysis frustrate meaningful review." *Id.* (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d

Cir. 2013) (per curiam)). Such is not the case here.

ALJ Munday identified Brenda S.'s maximum remaining capacity to lift and carry certain

amounts of weight by citing the relevant regulation. ALJ Munday sufficiently discussed both

Brenda S.'s report of symptoms and the objective medical evidence. ALJ Munday then

adequately assessed the opinion evidence of record. In particular, the ALJ assigned great weight

to the portion of the DDS physicians' opinions limiting Brenda S. to light work, explaining that

"[t]he evidence of record indicates the claimant would be capable of work at the light exertion

level." R. 23. She also noted that Brenda S. had "ample time to recover and return to light

---

[5] Requiring the ALJ to conduct this "initial function-by-function assessment" of the claimant's ability to
perform "specific work-related functions" before expressing the RFC in terms of the exertional levels of
work largely guards against the risk that the ALJ will "either overlook limitations or restrictions that
would narrow the ranges and types of work an individual may be able to do, or find that the individual has
limitations or restrictions that he or she does not actually have." SSR 96-8p, 1996 WL 374184, at *3, *4.

exertion work" following her most recent carpal tunnel surgery in January 2013. *Id.* These conclusions are largely consistent with the record, as well as Brenda S.'s own reports to her providers that she was recovering well from her procedure and experienced good results with subsequent treatment, R. 263, 285, 287. As such, the ALJ did not err in relying on these opinions. *See Gordon*, 725 F.3d at 235 ("[T]he opinion of a non-examining physician can be relied upon when it is consistent with the record."). ALJ Munday then explained that Brenda S.'s lower extremity limitations stemmed from her obesity and her environmental limitations stemmed from a hospitalization in April 2015 related to non-severe respiratory impairments. R. 23. The remainder of Brenda S.'s limitations logically could be attributed to her carpal tunnel syndrome. Thus, the ALJ's written decision adequately explains her RFC determination.

## V. Conclusion

For the foregoing reasons, I find that substantial evidence supports the Commissioner's final decision. Accordingly, I respectfully recommend that Brenda S.'s Motion for Summary Judgment, ECF No. 15, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 19, be **GRANTED**, the Commissioner's final decision be **AFFIRMED**, and this case be **DISMISSED** from the Court's active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: July 2, 2018

Joel C. Hoppe
United States Magistrate Judge